**United States District Court for
the District of Maryland**

| | |
|---|---|
| **United States**<br><br>    **v.**<br><br>**Richard Robertson** | **No. 8:22-po-0867-AAQ** |

**Motion to Dismiss Citation Under
the Second Amendment**

The Supreme Court's recent opinion in *New York State Rifle & Pistol Association,
Inc. v. Bruen*, 142 S. Ct. 2111 (2022), marked a dramatic shift in Second Amendment law.
Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of
the government's interest in firearm regulation against the degree of infringement on the
challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts,
instead, to consider only "constitutional text and history." 142 S. Ct. at 2128-29. If "the
Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the
Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the
presumption, the government must show that a challenged law "is consistent with the
Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The test for historical
consistency is demanding: a firearm regulation is consistent with American tradition only if
similar regulations were widespread and commonly accepted in the founding era, when the
Second Amendment was adopted.

Under the new framework mandated by *Bruen*, the Court should dismiss the citation
charging Richard Robertson with possessing a firearm on the campus of National Institutes

of Health ("NIH") under 45 C.F.R. § 3.42(g). Because possession of a firearm comes within the Second Amendment's "plain text," Mr. Robertson's conduct is presumptively protected. And the government will be unable to rebut that presumption. Blanket bans on possessing firearms on public land, even land that was home to government buildings, were alien to the generation that ratified the Second Amendment.

Therefore, the firearm possession charge must be dismissed and the evidence derived from the subsequently unlawful search, should also be excluded as fruits of the poisonous tree.[1]

## I.     Procedural History

Mr. Robertson has been charged with possession of a firearm on federal property in violation of 45 C.F.R. § 3.42(g),[2] displaying plates belonging to another vehicle, Md. Code Ann., Transp. § 13-411(g) and possession of a controlled substance, 21 U.S.C. § 844.

On February 2, 2022, at approximately 6:18 a.m., Mr. Robertson drove up to the Gateway Inspection Center entrance at the National Institutes of Health ("NIH"), located in Bethesda, Maryland.

Prior to being admitted onto campus, Mr. Robertson's vehicle was searched by a security guard. The security guard located a weapon in Mr. Robertson's center console.

---

[1] Unless otherwise indicated, case quotations in this motion omit citations, brackets, internal quotation marks, and other characters that do not affect the meaning of the cited language.

[2] "No person other than a specifically authorized police officer shall possess firearms, explosives, or other dangerous or deadly weapons or dangerous materials intended to be used as weapons either openly or concealed. Upon written request, the Director may permit possession in living quarters of antique firearms held for collection purposes, if the Director finds that the collection does not present any risk of harm." 45 C.F.R. §3.42(g).

Mr. Robertson was arrested, and it was later determined that the license plate of Mr. Robertson's vehicle belonged to another one of his vehicles. The vehicle was approved for towing. A further search of Mr. Robertson's vehicle revealed suspected controlled dangerous substance. Mr. Robertson was processed and issued a citation for the alleged offenses. Mr. Robertson was released from custody the same day.

On June 21, 2022, Mr. Robertson had his initial appearance. This case is currently set for trial on August 16, 2022.

## II.     Legal Background

### A.     Before *Bruen*, lower courts assessed Second Amendment challenges by applying means-ends scrutiny.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008). The Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, colonial law and practice leading up to and immediately following 1791, and evidence of how the Second Amendment was interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th-century commentary). *Id.* at 592-619. Based on this survey, the Court concluded the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. The Court therefore struck down District of Columbia statutes that prohibited the

possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years after *Heller*, in *McDonald v. City of Chicago*, the Court reaffirmed *Heller*'s "central holding": that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." 561 U.S. 742, 780 (2010). In holding that the Second Amendment applies against the states as well as the federal government, the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 767. And that right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Id.* But if the statute did burden Second Amendment conduct, courts then "appli[ed] the appropriate form of means-end scrutiny." *Id.* Courts employed strict scrutiny if a challenger's claim implicated "the core right identified in *Heller*—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Id.* at 225-26 (emphasis omitted). Otherwise, intermediate scrutiny applied. *Id.* Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's

interest in exercising his right to keep and bear arms. *See United States v. Hosford*, 843

F.3d 161, 168 (4th Cir. 2016).

**B.**     **Bruen replaced means-ends balancing with a test rooted solely in the**
          **Second Amendment's "text and history."**

The Supreme Court's recent opinion in *Bruen* disavowed the lower courts'

framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in

the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a

"text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

That standard directs courts to begin by asking whether "the Second Amendment's

plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution

presumptively protects that conduct." *Id.* Answering this threshold question in *Bruen* was

straightforward. At issue there was a New York law providing that, to obtain a permit to

carry a handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special

need for self-protection distinguishable from that of the general community." *Id.* at 2122-

23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protects

[the petitioners'] proposed course of conduct—carrying handguns publicly for self-

defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text

draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The

Second Amendment therefore "presumptively guarantees" a right to carry firearms in

public, and New York's "proper cause" requirement, which burdened that right, could pass

constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may

not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather,

the government must demonstrate that the regulation is consistent with this Nation's

historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136.[3] Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Nor should courts "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

---

[3] The Court reserved the question whether courts entertaining challenges to state statutes should examine history as of 1868, when the Fourteenth Amendment was adopted. *Id.* at 2137-38.

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent, but should otherwise afford it little weight. *Id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* ("[T]o the extent later history contradicts what the text says, the text controls.").

The Court in *Bruen* held that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. In reaching that conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow. The Court said, for instance, that "[i]n some cases," the historical inquiry "will be fairly straightforward":

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier

generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131; *see also id.* (explaining that if "the Founders themselves could have adopted" a particular regulation "to confront" "a perceived societal problem," but did not do so, then that regulation is unconstitutional today).

In "other cases," challenged statutes will "implicat[e] unprecedented societal concerns or dramatic technological changes," which "may require a more nuanced approach." *Id.* at 2132. When firearms pose "regulatory challenges" that are "not . . . the same as those that preoccupied the Founders in 1791," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.*; *see also id.* (directing courts to use "analogical reasoning" when confronting "present-day firearm regulations" that "were unimaginable at the founding"). Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* The Court in *Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original).

The Court also stressed the limits of reasoning by analogy:

To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* (emphasis in original).

Whether based on "distinctly similar" precursors or merely "historical analogues," the "comparable tradition of regulation" must be robust. *See id.* (requiring "a well-established and representative" historical analogue); *id.* at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if* that practice "has been open, widespread, and unchallenged since the early days of the Republic"). A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-century "surety laws" that New York argued were precursors to its "proper cause" requirement, the Court discounted two of those ten laws—which were closest to New York's—as unrepresentative. *See id.* at 2148 n.24. Moreover, even if certain statutes were widespread, courts should not consider them determinative unless the historical record reveals the statutes were actually enforced. *See id.* at 2149 (dismissing surety laws because "respondents offer little evidence that authorities ever enforced [those] laws").

Finally, *Bruen* emphasized—repeatedly—that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. The "[g]overnment bears the burden" of "affirmatively prov[ing]

9

that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127, 2130; *see also, e.g.*, *id.* at 2141 n.11 ("But again, because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope."). Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150; *see also id.* at 2149 n.25 ("[T]he burden rests with the government to establish the relevant tradition of regulation.").

## III.   Argument

The regulation underlying Mr. Robertson's citation, which makes it illegal to "possess firearms" on the NIH campus, 45 C.F.R. § 3.42(g), violates Mr. Robertson's Second Amendment right to keep and bear arms. Under the Second Amendment's "plain text," a total prohibition on firearm possession is "presumptively" unconstitutional. *Bruen*, 142 S. Ct. at 2126. The government will be unable to rebut that presumption. There was no "historical tradition," as of 1791, of altogether barring individuals from possessing firearms on all federal land. Nor does the NIH qualify as a "sensitive place" where bans on firearm possession can be presumed to pass constitutional muster. At the time of the founding, the "sensitive places" designation—to the extent it existed at all—was reserved for a small, select group of settings where the core functions of government were performed. Because the NIH does not fall into that category, the sensitive-places doctrine cannot save § 3.42(g). The Court should dismiss the citation against Mr. Robertson.

**A.    The Second Amendment presumptively protects Mr. Robertson's right to carry a firearm on the NIH campus.**

*Bruen* directs courts to begin the Second Amendment analysis by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* The answer to that question is not difficult in Mr. Robertson's case.

The Second Amendment secures the right of "the people" to "keep and bear arms." There can be no doubt that Mr. Robertson is among "the people" whom the Second Amendment protects. *See Heller*, 554 U.S. at 580 (noting that "'the people' . . . unambiguously refers to *all* members of the political community, *not an unspecified subset*" (emphasis added)); *Bruen*, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to *all Americans* the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." (emphasis added)). And a handgun, the type of firearm Mr. Robertson is charged with possessing, is the quintessential "arm" for Second Amendment purposes. *Heller*, 554 U.S. at 628-39.

Moreover, as *Bruen* made clear, the right to "bear" arms "naturally encompasses public carry." 142 S. Ct. at 2134. This meaning of "bear" is consistent with the "central component" of that right: "the Second Amendment guarantees an individual right to possess and carry weapons in case of confrontation, and confrontation can surely take place outside the home." *Id.* The Second Amendment therefore extends to places outside the home, such as the NIH campus.

**B.    The government will be unable to rebut the presumption that § 3.42(g) is unconstitutional.**

Because "the Second Amendment's plain text covers [Mr. Robertson's] conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. To rebut the presumption,

the government must establish that § 3.42(g) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government will be unable to do so.

Although it is not entirely clear, the "general societal problem" to which § 3.42(g) is addressed, *id.* at 2131, presumably involves the threat that violence will disrupt the performance of government functions. If so, then the problem is one "that has persisted since the 18th century." *Id.* The government, therefore, can rebut the presumption of unconstitutionality only by showing a historical tradition of regulations "distinctly similar" to § 3.42, which categorically forbids possessing firearms on the NIH campus. *Id.* Mr. Robertson is unaware of a tradition of firearm regulations, circa 1791, that "broadly prohibit[ed]" carrying firearms on government lands or in government buildings like NIH's. *Id.* at 2138. As a result, the government will be unable to overcome the presumption of unconstitutionality.

Mr. Robertson anticipates the government will argue § 3.42(g) is constitutional because the NIH campus qualifies as a "sensitive place" where gun prohibitions are presumptively lawful. This argument rests on "precautionary language" that the Court included in *Heller*. *See Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc). After completing its historical survey, and before assessing the constitutionality of the District of Columbia's statutes, the *Heller* Court wrote that the Second Amendment right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. It then added the language that Mr. Robertson expects the government to cite in this case:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in

       sensitive places such as schools and government buildings, or laws imposing
       conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In an accompanying footnote, the Court wrote, "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26.

      The government may contend this portion of *Heller* definitively establishes that public-carry bans in all "sensitive places," such as the NIH campus, are consistent with the Second Amendment. That view is mistaken for two reasons. First, the "sensitive places" language in *Heller* is dicta that lacks the historical support demanded by *Bruen*. And second, even assuming the sensitive-places doctrine can be grounded in history, it is limited to places, such as courthouses and legislative assemblies, where the "core" functions of government are performed.

      **1.**    ***Heller*'s discussion of "sensitive places" is historically unsupported dicta.**

      The question of possessing firearms in federal buildings was not before the Court in *Heller*, and any statements in the opinion addressing that question are therefore dicta. *See United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (describing passage in which sensitive-places doctrine appears as "dicta"); *see also, e.g.*, *Tyler*, 837 F.3d at 686-87 (in 18 U.S.C § 922(g) case, describing *Heller*'s "presumptively lawful" language as "dictum"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (same); *United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) (characterizing "presumptively lawful" language as "the opinion's *deus ex machina* dicta"). The result is that, as the en banc Seventh Circuit has explained, *Heller*'s "presumptively lawful" passage should not be regarded as a holding:

The language we have quoted warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court's disposition. Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration.

*United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc); *accord Tyler*, 837 F.3d at 687 (same).

Of course, lower courts should "give great weight to Supreme Court dicta," *N.L.R.B. v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016), at least when the Court's opinion engages in an "extended discussion" of an issue, the Court gives "full and careful consideration to the matter," and the issue is "important, if not essential, to the Court's analysis," *Hengle v. Treppa*, 19 F.4th 324, 346-47 (4th Cir. 2021). Ultimately, however, lower courts "are not bound by dicta or separate opinions of the Supreme Court." *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005). Where the Supreme Court's discussion of an issue is "peripheral" or "cursory," courts need not defer to it. *Hengle*, 19 F.4th at 347. The Fourth Circuit has therefore declined to follow Supreme Court dicta that is "unaccompanied by any analysis from which [it] might gain insight into the Court's reasoning." *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008); *see also id.* at 283 (refusing to "afford[] talismanic effect" to unexplained Supreme Court dicta). Other courts, too, disregard dicta for which the Supreme Court provides no reasoning or analysis. *See, e.g.*, *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) ("[W]e conclude that the brief dictum to which we allude should not dictate the result here."); *cf. Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (choosing to follow Supreme

14

Court dicta because it was "not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta").

*Heller*'s discussion of "sensitive places" is exactly the kind of Supreme Court dicta unentitled to "talismanic effect." *In re Bateman*, 515 F.3d at 283. It was "unaccompanied by any analysis," *id.*, and was—at best—"peripheral" to the questions at issue, *Hengle*, 19 F.4th at 347. The *Heller* Court provided no "extended discussion" of sensitive-places laws. *Hengle*, 19 F.4th at 346. While the Court described banning firearm possession in sensitive places such as schools and government buildings, 554 U.S. at 626, it "never actually addressed the historical pedigree" of those laws, *see Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting) (discussing felon-disarmament laws). Indeed, the Court prefaced its reference to "sensitive places" by noting that it "d[id] not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626. The Court, in other words, did not even claim it had surveyed the relevant history and discovered a (robust but undisclosed) tradition of sensitive-places laws dating back to the founding era. It simply asserted such laws were longstanding, and therefore presumptively lawful, "without any reasoning or explanation." Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1567 (2009).

*Heller* itself indicates that its dicta should not control here. Dissenting in *Heller*, Justice Breyer criticized the reference to "presumptively lawful" regulations as "*ipse dixit*," noting that the majority "fail[ed] to cite any colonial analogues" to such statutes. 554 U.S. at 721-22. The majority responded that there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635. This rejoinder suggests the *Heller* Court assumed a

"presumptively lawful" statute would be constitutional "*if that [statute] is consistent with history and tradition*." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 252 (2020) (emphasis added). The Court's allusion to "expound[ing] upon the historical justifications" for sensitive-places laws would make no sense if the Court believed those laws were permissible *regardless* of whether history supported those prohibitions.

And—crucially—the Court stressed that it had not canvassed the historical record and made a determination, one way or the other, about whether that record supported sensitive-places laws. *Heller*, 554 U.S. at 626 ("[W]e do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment."). *Bruen*, in turn, affirmed that *Heller* did not purport to settle any questions beyond those necessary to resolve the petitioners' claim. 142 S. Ct. at 2128 (noting *Heller* described Second Amendment right as "not unlimited," but adding, "That said, we cautioned that we were not 'undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment' and moved on to considering the constitutionality of the District of Columbia's handgun ban"). The Court should therefore decline to treat *Heller*'s "presumptively lawful" language as determinative of sensitive-places laws' constitutionality. Instead, those laws, like all others, must be subject to *Bruen*'s rigorous "text-and-history standard." *Id.* at 2138.

Based on Mr. Robertson's research, it appears the government will be unable to establish that carrying firearms in "sensitive places" was "broadly prohibit[ed]" in the founding era, or that such bans have been "widespread" and "unchallenged since the early days of the Republic." *Id.* at 2137-38. Mr. Robertson has found only three pre-

Reconstruction statutes—two of them from the same state—that barred possession of firearms in supposedly "sensitive" places such as legislative assemblies or courthouses. *See* 1647 Md. Laws 216 (legislature); 1650 Md. Laws 273 (same); 1786 Va. Acts 33, ch.21 (appearing before "Justices of any Court, or other of their Ministers of Justice"). In addition, the Delaware constitution of 1776 forbade taking firearms to polling places. Del. Const., art. 28 (1776). These three jurisdictions are insufficient to demonstrate a robust tradition of sensitive-places prohibitions in the founding era. *See Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation." (emphasis in original)).[4]

Mr. Robertson recognizes that *Bruen* also mentioned "sensitive places" in its discussion of analogical reasoning:

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

---

[4] Mr. Robertson's research also uncovered a number of sensitive-places statutes enacted during or after Reconstruction—for example, an 1870 Texas law prohibiting the carry of firearms in "any church or religious assembly, any school-room or other place where persons are assembled for educational, literary, or scientific purposes, or [any] ball room, social party, or other social gathering, composed of ladies and gentleman," or in "any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election" or "any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly." George Washington Paschal, Reporter, 3 A Digest of the Laws of Texas 1322, An Act Regulating the Right to Keep and Bear Arms. Art. 6511 (1870). But this "later history contradicts" the historical practice leading up to and immediately following the Second Amendment's ratification in 1791. *Bruen*, 142 S. Ct. at 2137. Because these "post-Civil War" laws do not provide "confirmation" of founding-era practice, but instead are "*inconsistent* with the original meaning of the constitutional text," they cannot discharge the government's burden under *Bruen*. *Id.* (emphasis in original).

17

*Id.* at 2133 (emphasis in original). Just as in *Heller*, however, the question of sensitive-places laws' historical pedigree was not at issue in *Bruen*. This passage is therefore dicta just as much as *Heller*'s reference to "presumptively lawful" sensitive-places statutes. Indeed, the Court in *Bruen* made clear it was not settling the question of whether sensitive-places laws are consistent with the Second Amendment. It said it was "aware of no disputes regarding the lawfulness of such prohibitions," and therefore would merely "assume" such laws are constitutionally permissible. But Mr. Robertson *does* dispute that such laws are "consistent with this Nation's historical tradition of firearm regulation," *id.* at 2136, and this Court therefore cannot simply assume such laws are constitutional.

The government will be unable to establish that sensitive-places laws are consistent with the Second Amendment as it was understood in 1791.

> **2.    Even assuming the sensitive-places doctrine enjoys historical support, it does not extend to places like the NIH campus.**

Assuming for sake of argument that the sensitive-places doctrine has support in the historical record, it is not so broad as to sweep in every government office building or every piece of government land, like those at NIH. The doctrine, to the extent it is rooted in history at all, is limited to sites like those referenced in *Bruen*—"legislative assemblies, polling places, and courthouses." *Id.* at 2133.

In the "first [article] to analyze the full scope of the sensitive places doctrine," Second Amendment scholars David Kopel and Joseph Greenlee write that the sensitive-places doctrine traces its roots to a 1313 English statute barring arms "in all parliaments" and to the 1328 Statute of Northampton. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places' Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 207, 211-12 (2018). The latter statute made it a crime not only to "come before

the King's justices, or other of the King's ministers doing their office, with force and arms," but also to "go []or ride armed by night or by day, in fairs[ or] markets." *Id.* at 214 n.32 (citing 2 Edw. 3, c. 3 (1328)). By "the time of American independence," however, "England's locational restrictions appear to have ceased to exist as a matter of enforceable law, except for Parliament and courts." *Id.* at 229. Thus, bans on carrying firearms in places other than courts and legislative assemblies "had become obsolete in England at the time of the adoption of the Constitution," rendering them irrelevant to *Bruen*'s historical inquiry. 142 S. Ct. at 2136.

Meanwhile, "American arms culture began to separate from its English ancestor as soon as the settlers of the Virginia Company embarked from England in 1606." Kopel & Greenlee, *supra*, at 229. Kopel and Greenlee's article—on which *Bruen* relied when synthesizing the (assumed) sensitive-places doctrine, *see* 142 S. Ct. at 2133—explains that not only did colonial and early American laws not prohibit guns in public places, but in fact they "typically *required* that arms be brought to churches or to all public meetings." Kopel & Greenlee, *supra*, at 233 (emphasis added); *see also id.* at 235 ("In general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed."). Although a few jurisdictions did enact sensitive-places laws in the founding era, those laws extended only to "centers of government deliberation," i.e., legislative assemblies, courthouses, and polling places. *Id.* at 230-36, 244. Following the Civil War, a handful of other states also banned firearms in courthouses and at polling places, but even then they represented "the minority approach." *Id.* at 244-47, 263 (citing statutes from Louisiana, Maryland, Texas,

and Georgia). It was not until "the later part of the twentieth century" that the United States saw "[w]idespread bans on arms in government buildings or schools." *Id.* at 263. In short, "While gun bans in certain government buildings and in polling places do have historical precedent, bans that apply to *all* government buildings do not." *Id.* at 289 (emphasis in original).

Likewise, the second source on which *Bruen* relied when summarizing the sensitive-places doctrine—an amicus brief submitted by the Independent Institute, *see* 142 S. Ct. at 2133—confirms that "true gun-free zones were quite rare" during the founding era. *United States v. Bruen*, No. 20-843, Brief for Independent Institute as *Amicus Curiae* 7. The sensitive places covered by such laws generally included only "places where government officials met to conduct the core functions of government (*e.g.*, state legislatures and courthouses), polling places, and schools" (and in the latter category, the bans applied only to students, not teachers). *Id.* at 7-8. Those statutes did not extend to "[z]ones in which government burecrats [sic] conduct ministerial affairs (*e.g.*, post offices and departments of motor vehicles), rather than those in which the core legislative, executive, and judicial powers are executed." *Id.* n.4. If a given location was not the site of "core government operations," like a legislative assembly or courthouse, then it was not subject to a ban on firearms possession. *Id.* at 12-13; *accord* Kopel & Greenlee, *supra*, at 294 ("Despite *Heller*'s dicta, wide-ranging bans on bearing arms 'in sensitive places such as schools and government buildings' have a weak foundation in history and tradition. Bans in particular government buildings, such as legislatures, polling places, and courthouses, have a stronger basis.").

The NIH does not host "core government operations" in the way a courthouse or legislative assembly does. It therefore falls outside the scope of the sensitive-places doctrine, even assuming that doctrine is consistent with *Bruen*'s "text-and-history standard." 142 S. Ct. at 2138.

## IV.    Conclusion

The regulation under which Mr. Robertson is charged, 45 C.F.R. § 3.42(g), violates the Second Amendment as it was understood in 1791. The Court should therefore dismiss the corresponding citation in this case. Further, because the remaining two charges are based on evidence derived from the illegal stop and search based on the firearm, the Court should exclude that evidence and dismiss the remaining charges.

Respectfully submitted,

James Wyda
Federal Public Defender


_____/s/_____
Rosana Chavez
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 344-0600
Fax: (301) 344-0019
Email: rosana_chavez@fd.org